UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RICHARD FREDRICK KAISER, JR.,

                        Plaintiff,                  **REPORT AND**
                                                       **RECOMMENDATION**
                                                  CV 19-7029 (JMA) (ARL)

                -against-

ANDREW W. SAUL,
Commissioner of Social Security,

                        Defendant.
-------------------------------------------------------------X

**LINDSAY, Magistrate Judge:**

       Plaintiff Richard Fredrick Kaiser, Jr. ("Plaintiff") commenced this action pursuant to the

Social Security Act, 42 U.S.C. § 405(g) (the "Act") seeking judicial review of a final decision of

defendant Andrew W. Saul (the "Commissioner" or "Defendant"), the commissioner of the

Social Security Administration ("SSA") at the time of filing, which denied his application for

disability insurance benefits.  Presently before the undersigned, upon the referral of the

Honorable Joan M. Azrack for Report and Recommendation, are the parties' cross-motions for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Plaintiff requests that "the Commissioner's decision be vacated, and that this matter be remanded

for a directed finding of disability and calculation of benefits. In the alternative, it is respectfully

requested that Plaintiff's Motion be granted, that the Commissioner's decision be vacated, and

that this matter be remanded for further administrative proceedings, including a de novo hearing

and new decision."  Pl. Reply Mem. at 4.  The Commissioner moves for judgment pursuant to

Fed. R. Civ. P. 12(c) affirming his final decision that Plaintiff was not disabled.  For the reasons

set forth below, the undersigned respectfully recommends that (1) Plaintiff's motion for

judgment on the pleadings be granted in part, and denied in part, (2) Defendant's cross-motion for judgment on the pleadings be denied and (3) the case be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

## BACKGROUND

### I.    Procedural History

On May 21, 2016, Plaintiff completed his application for social security benefits, including a period of disability and all insurance benefits available under Title II of the Act. Transcript of the Record of Proceedings ("Tr.") at 319, Ex. No. 1D.  In his application, Plaintiff alleged that his disability began on January 10, 2011 and his disability was continuing.  *Id.* at 219.  Plaintiff claimed that he was unable to work because of physical conditions related to his back, heart and both knees.  *Id.*  Plaintiff stopped working on January 10, 2011.  *Id*

After conducting an initial review, on August 16, 2016, the SSA denied Plaintiff's application for benefits.  *Id.* at 229.  On September 16, 2016, Plaintiff filed a written request for a hearing.  *Id.* at 10.  A video hearing was conducted on August 6, 2018 before Michael Carr, Administrative Law Judge ("ALJ").  *Id.* at 183-216.  Plaintiff appeared at the hearing and provided testimony.  *Id.*  Plaintiff was represented by counsel.  *Id.* at 231.

On October 25, 2018, the ALJ denied Plaintiff's claim for social security disability insurance.  *Id.* at 10-20.  The ALJ found Plaintiff was capable of performing jobs that existed in significant numbers in the national economy and therefore Plaintiff was not disabled.  *Id.* at 18. Plaintiff appealed the decision of the ALJ.  On October 16, 2019, the Office of Disability Adjudication and Review denied Plaintiff's request for review of the ALJ's decision.  *Id.* at 1. Thus, the ALJ's decision became the final decision of the Commissioner.  *Id.*

Plaintiff commenced the instant action on December 16, 2019 seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  ECF No. 1.  On September 17, 2020, Plaintiff moved for judgment on the pleadings.  ECF No. 9.  Defendant cross moved for judgment on the pleadings on September 17, 2020.  ECF No. 11.  By Order dated May 25, 2021, Judge Azrack referred the cross-motions to the undersigned for a Report and Recommendation.

### II.    Factual Background

#### A.  Non-Medical Evidence

Plaintiff was born on September 7, 1964.  Tr. at 218.  Plaintiff completed two years of college in 2006.  *Id*. at 353.  He worked as a registered nurse from September 2006 through January 2011.  *Id*.  Prior to that, Plaintiff was the director of security for a hotel in New York from 1998 through 2006.  *Id*. at 373.

Plaintiff testified that he is married and lives in a house with his family.  *Id*. at 205, 378. In a disability report completed by Plaintiff following his injury, which Plaintiff claims occurred on August 25, 2010, Plaintiff reported that he was able to take care of his daily needs, such as bathing, eating, stretching, attending medical appointments and driving.[1]  *Id*. at 378, 466, 528. He also cares for his pets by letting them in and out of the house.  *Id*. at 379.  Plaintiff reported that he is able to dress and bathe himself with some discomfort, and, prepares meals for himself daily.  *Id*. at 380.  In addition, Plaintiff noted that he has a landscaper that mows his lawn and that he is able to do light household chores, depending on the day.  *Id*. at 380-81.  With respect to shopping, Plaintiff reported that he is able to drive and travel independently and that he does go shopping occasionally for a few items.  *Id*. at 381. He is also able to visit friends and engage in

---

[1] This report was submitted on May 16, 2016.  *See* Tr. Ex. 1E.

hobbies such as reading, watching television and socializing. *Id*. at 382. He noted that on most days he is able to walk for ten to fifteen minutes without difficulty. *Id*. at 384.

In addition to the information provided on his disability application, Plaintiff also provided testimony regarding his disability at the hearing before the ALJ on August 6, 2018. *Id*. at 185-217. He stated that he does some yard work with his wife's help and occasionally mows the lawn with a self-propelled mower. *Id*. at 205. He also testified that his wife does the grocery shopping, carrying the bags herself and also does the laundry. *Id*. at 206. Plaintiff testified that he walks 10-15 minutes at a stretch and that he walks around the block several times a day. *Id*. at 204. He also testified that has difficulty standing in one place and lifting anything heavier than a gallon of milk on a regular basis, although he believes he would be able to lift 30-40 pounds on occasion. *Id*. at 206. Additionally, Plaintiff testified that he cannot sit for more than an hour at a time and spends most of his day either laying on the couch or in bed. *Id*. at 208-209. He also noted that his ability to extend his legs while sitting would not impact the length of time he can sit. *Id*. at 208. Plaintiff stated that he was "absolutely" unable to hold a job which allowed him to sit and stand whenever he wanted and do no lifting because "[e]very day's an adventure. At least three or four days a week, I'm, kind of, limited, really, mostly in the house and in the backyard. . . . I'll read. I'll lay down, watch TV, ice my leg." *Id*.

### B.  Medical Evidence

#### 1.  Medical Evidence by Plaintiff's Providers

According to Plaintiff's application for disability benefits his disability began on January 10, 2011. *Id*. at 319. There is an MRI of the lumbar spine dated January 11, 2011 revealing spondylitic change with degenerative disc desiccation at L5-S1, with a moderate sized right posterolateral disc herniation extending into the right foramen, some impingement of the

4

descending right S1 nerve root (no compression), mild right-sided foraminal stenosis, and mild facet hypertrophy at L5-S1.  *Id*. at 426.  In addition, an MRI of the left knee dated April 14, 2011 revealed fraying of the apex of the posterior horn and body of the medial meniscus with mild extrusion of the medial meniscus into the medial gutter.  *Id*. at 424.  The MRI also revealed, "more than 50% cartilage thinning and fibrillation," in the articular cartilage of the medial compartment and a near-full-thickness cartilage fissure with focal undermining of the patellar apex.  *Id*.  Both reports state they were ordered by Dr. Lanzone, however, no medical records have been provided by Dr. Lanzone.

On June 9, 2011, Plaintiff was treated by Dr. Alexandre deMoura, for complaints  of lower back and right lower extremity pain.  *Id*. at 528.  Dr. deMoura noted that Plaintiff currently took Advil, Soma, and Percocet for pain and diagnosed Plaintiff with low back pain, lumbar degenerative disc disease, lumbar radiculitis, and lumbar herniated nucleus pulposus and recommended further diagnostic testing and consultation.  *Id*.  Lumbar spine x-rays dated June 9, 2011 revealed minimal osteoarthritic changes including mild arthropathy of L5.  *Id.* at 687.

Plaintiff saw Dr. Charles Kaplan of the New York Spine Institute on June 10, 2011, at the suggestion of Dr. deMoura.  There are no examination notes from this visit, however, Dr. Kaplan nevertheless concluded that Plaintiff was "totally disabled."  *Id*. at 532.  Dr. Kaplan did not provide an assessment of Plaintiff's ability to function in the work place on a task by task basis. Dr. Kaplan administered injections in the bilateral lumbar paraspinal muscles and bilateral gluteal muscles.  *Id*.  Plaintiff also saw Dr. Kaplan on July 8, 2011.  *Id*. at 532-539.  The examination noted myofacial trigger points to the bilateral lumbar paraspinal muscles, decreased lordosis, tenderness to palpation bilateral paravertebral with  and flexion of 30 degrees, extension of 10 degrees, and lateral flexion 10 degrees.  *Id*. at 538.  Dr. Kaplan administered injections at

right bilateral lumbar paraspinal muscles.  *Id*.  He assessed radiculopathy, lumbar disc displacement and myofacial pain syndrome.  *Id*.  In July 2011, Dr. Kaplan did not repeat his earlier conclusion that Plaintiff was totally disabled.  *Id*. at 539.

On August 5, 2011, Dr. Kaplan evaluated Plaintiff concerning low back and left lower extremity pain with neurologic symptoms.  *Id*. at 540.  The examination noted myofacial trigger points to the bilateral lumbar paraspinal muscles with moderate hypertonicity and flexion of 30 degrees, extension of 10 degrees, and lateral flexion 10 degrees bilaterally.  *Id*. at 541.  Dr. Kaplan administered injections at right L3 and L5 and the right pirifomis.  *Id*. at 541.  He assessed radiculopathy and myofacial pain syndrome.  *Id*. at 541.  Dr. Kaplan noted Plaintiff was to continue physical therapy and stated he was unable to work.  *Id*. at 541, 542.  According to Dr. Kaplan, Plaintiff was totally disabled.  *Id*. at 542.  Once again, while Dr. Kaplan concluded Plaintiff was totally disabled he did not provide a functionality breakdown  Plaintiff saw Dr. Kaplan again on October 14, November 18 and December 23, 2011 and the reports were largely the same, repeating his conclusion that Plaintiff was totally disabled.  *Id*. at 537-39, 660-675.  On November 18, 2011, Dr. Kaplan noted that Plaintiff had an "EMSI stim unit" which afforded "mild relief while actually using it." *Id*. at 663.  In December 2011, Dr. Kaplan noted that Plaintiff was awaiting authorization for physical therapy.  *Id.* at 670.

Plaintiff underwent a physical therapy evaluation on September 13, 2011 which revealed diminished sensation to light touch to the right L5 level when compared to the left, moderate to severe bilateral hamstring tightness, and moderate bilateral piriformis tightness.  *Id*. at 543.  Lumber lateral flexion and rotation were limited.  *Id*. at 543.

On January 9, 2013, Plaintiff began seeing Dr. Debora Mottahedeh of the New York Spine Institute concerning his low back pain with "left" lower extremity symptoms.[2]  *Id*. at 657. Dr. Mottahedeh noted myofascial trigger points to the bilateral lateral paraspinal muscles and flexion of 45 degrees, extension of 10 degrees, and lateral flexion  of 10 degrees bilaterally.  *Id*. at 658. There was normal sensation.  *Id*.  Dr. Mottahedeh administered an epidural steroid injection to the right lumbar paraspinal muscles and right gluteal muscles.  *Id*.  Dr. Mottahedeh diagnosed lumbar radiculopathy, lumbar disc displacement, and myofascial pain syndrome and prescribed Soma and Nucynta.  *Id*. at 659.  Plaintiff continued  treatment with Dr. Mottahedeh on February 2, March 4, April 1, May 8, June 10, July 8, August 14, September 17, and November 6 and 20, 2013, for low back pain and left lower extremity pain.  *Id*. at 654, 651, 648, 639 642, 639 636.  At no point to Dr. Mottahedeh opine that Plaintiff was disabled nor did she note Plaintiff's functionality.

On February 20, 2013, a lumbar spine MRI ordered by Dr. Mottahedeh revealed slightly decreased paracentral/foraminal disc herniation at L5-S1, but with persistent impingement of the descending right S1 nerve roots within the right lateral recess and abutment of the undersurface of the exiting right L5 nerve root.  *Id*. at 816.  It further showed stable mild disc disease from L1-2 through L4-5 in the setting of a developmentally small spinal canal, mild spinal stenosis at L2-3 and L4- 5, and mild to moderate spinal stenosis at L3- 4.  *Id*. at 816-17.  There was also multilevel neural impingement.  *Id*. at 816-17.  In March, June and July 2013, Dr. Mottahedeh noted that Plaintiff needed more aggressive treatment of the spine, planning epidural steroid injections.  *Id*. at 522, 644, 653.

---

[2] There are no medical records provided for 2012, although, Plaintiff was examined in connection with a worker's compensation claim in June 2012.  That report is discussed, in Section B.2., *infra*.

On November 13, 2013, Plaintiff followed up with his primary care provider Dr. July Gaysynsky. *Id.* at 546. Plaintiff's only complaint related to his left knee. *Id.* Upon examination, Dr. Gaysynsky noted Plaintiff was not in acute distress. *Id.* The doctor his muscle strength was full (5/5) in all muscle groups, but he had a left limp and left knee joint tenderness. *Id.* at 547. No neurologic deficits and a chest x-ray on the same date revealed normal heart and no active pulmonary disease. *Id.* at 549. Dr. Gaysynsky cleared Plaintiff for surgery. *Id.* at 550.

On December 3, 2013, Plaintiff underwent left knee arthroscopy with partial meniscectomy. *Id.* at 552. On December 11, 2013, Plaintiff had a post-operative visit with Dr. Stan Avshalumov, and reported no acute complaints other than occasional stiffness. *Id.* On December 13, 2013, Plaintiff had another post-operative visit with Dr. Avshalumov and complained of right knee pain unrelated to the left knee surgical procedure. *Id.* at 497. Dr. Avshalumov reviewed plain film of Plaintiff's right knee and noted mild joint space narrowing and osteophyte formation and subchondral sclerosis. *Id.* at 500. He assessed status post left knee arthroscopy and right knee osteoarthritis, internal derangement, contusion, and pain. *Id.* Dr. Avshalumov did not evaluate Plaintiff's functionality.

On December 23, 2013, Plaintiff was treated by Dr. Mottahedeh for low back pain and bilateral lower extremity pain. *Id.* at 624. Dr. Mottahedeh noted myofascial trigger points to the bilateral lateral paraspinal muscles and flexion of 70 degrees, extension of 10 degrees, and lateral flexion 25 degrees bilaterally. *Id.* at 625. Dr. Mottahedeh administered an epidural steroid injection to bilateral lumbar paraspinal muscles. *Id.* Dr. Mottahedeh diagnosed lumbar radiculopathy, lumbar degenerative disc disease, lumbar disc displacement, myofascial pain syndrome and lumbar spinal stenosis. *Id.* at 626.

8

On January 8, 2014, Plaintiff saw Dr. Avshalumov, for 5 of 10 left knee pain status post surgery on December 3, 2013. *Id*. at 508. Plaintiff reported that physical therapy had not helped much. *Id*. at 508. The assessment noted traumatic osteoarthritis, internal derangement, and contusion to the left knee. *Id*. at 509. Plaintiff was to continue physical therapy. *Id*. at 509. On January 11, 2014, an MRI of the right knee ordered by Dr. Avshalumov revealed an extensive tear of the posterior body and horn of the medial meniscus with meniscal material flipped into the region of the intercondylar notch, patella alta, bipartite patella as well as narrowing of the lateral patellar fact and chondromalacia patella, trace effusion, and a popliteal cyst. *Id*. at 556.

On February 20, 2014, Plaintiff saw Anthony Guttieri, R.P.A. on behalf of Dr. deMoura. *Id*. at 623. He noted upon examination that Plaintiff's lumbar spine was unremarkable, with tenderness and muscle spasm present, and decreased and painful range of motion. *Id.* R.P.A. Guttieri diagnosed low back pain, lumbar degenerative disc disease, lumbar radiculitis, and lumbar herniated nucleus pulposus. *Id.* R.P.A. Guttieri did not evaluate Plaintiff's functionality.

On February 21, 2014, Dr. Avshalumov noted Plaintiff's knee was feeling better (1 of 10 pain), though with frequent catching and locking while walking and exacerbation of symptoms with prolonged standing. *Id*. at 511. Dr. Avshalumov noted that Plaintiff reported "[t]he symptoms are at times severe enough to interfere with his normal activities of daily living." *Id*. at 511. He continued to participate in physical therapy three times per week. *Id*. at 511. He complained of pain in the right knee. *Id*. at 511. Examination of the right knee showed tenderness to palpation and limited motor strength and Plaintiff's sensation was intact. *Id*. at 514 Dr. Avshalumov assessed right knee post traumatic meniscal tear, internal derangement, and contusion and found right knee surgery medically necessary. *Id*.

Plaintiff returned to Dr. Mottahedeh on March 25, 2014, reporting low back pain with right lower extremity neurologic symptoms. *Id*. at 620. Plaintiff reported that his symptoms

9

were worse with bending, getting out of bed, lifting, standing, and sitting, however, the doctor did not provide an evaluation of Plaintiff's functionality.  *Id*.  Plaintiff also reported he had an exacerbation of symptoms the week prior when helping his mother into a car. *Id*.  The examination noted myofascial trigger points, 70 degrees of lumbar flexion, 10 degrees extension, and 25 degrees lateral flexion with hypertonic paravertebrals.  *Id*. at 621. Sitting root test was positive on the right.  *Id*.  Dr. Mottoahedeh opted to repeat epidural injections as needed, and stated Plaintiff was doing well.  *Id*. at 622.  She prescribed Soma, Lidoderm, and Nucynta. *Id*. Dr. Mottahedeh's April 22 and May 20, 2014 exams remained largely the same. *Id*. at 691, 694-95.

On April 23, 2014, Plaintiff saw Talia Subin, PA, at NYU Hospitals Center for his low back pain, which he reported rated at a severity of 7 of 10, with intermittent 5 of 10 right leg pain.  *Id*. at 561.  Plaintiff reported that his pain was worsened by sitting, standing and walking, and it was improved by elevating his leg while lying down.  *Id*. at 561.  A spinal evaluation showed that Plaintiff had a reduced range of motion of lumbar spine, but retained full muscle strength (5/5) in the upper and lower extremities.  *Id*. at 562.  Plaintiff could heel and toe walk without difficulty.  *Id*.  His straight leg-raising test was negative bilaterally and his sensation to light touch was grossly intact in the upper and lower extremities.  *Id.*  Lumbar spine x-rays revealed minor changes of cartilage degeneration in the disc spaces L4-5 and L5-S1 and negative pelvis and hip study.  *Id*. at 559  PA Subin stated that Plaintiff was a candidate for limited lumbar discectomy at right L5-1.  *Id*.  On December 3, 2014, Plaintiff returned to PA Subin for a follow up of his right sided low back pain (7 of 10) radiating to the right lower extremity (intermittent leg pain 5 of 10).  *Id*. at 431.  Plaintiff reported that pain was improved by elevating his leg while lying down.  *Id*.  Right straight leg raise was positive. *Id*.  PA Subin assessed right lumbar

radiculopathy secondary to right paracentral/foraminal disc herniation at L5-S1. *Id.* She once

again stated that Plaintiff was a candidate for limited lumbar discectomy at right L5-1. *Id.* P.A.

Subin did not evaluate Plaintiff's functionality.

On January 7, 2015, Plaintiff returned to Dr. Mottahedeh once again for low back pain.

*Id.* at 732. Dr. Mottahedeh noted that Plaintiff has been stable on pain medications. *Id.* Dr.

Mottahedeh noted myofascial trigger points to the bilateral lateral paraspinal muscles and flexion

of 70 degrees, extension of 10 degrees, and lateral flexion of 25 degrees bilaterally. *Id.* at 734-

35. Dr. Mottahedeh reported that Plaintiff's gait was normal and was not antalgic. *Id.* at 734.

She also noted that there was decreased light touch at right L4, L5, and S1 and positive seated

root test on the right. *Id.* at 733. Dr. Mottahedeh administered an epidural steroid injection to

bilateral lumbar and left thoracic paraspinal muscles. *Id.* at 735. Dr. Mottahedeh diagnosed

lumbar radiculopathy, lumbar degenerative disc disease, lumbar disc displacement, myofascial

pain syndrome, and lumbar spinal stenosis. *Id.*

On January 28, 2015, Plaintiff had a myocardial infarction and underwent stent

placement and cardiac catheterization at St. Francis Hospital. *Id.* at 593. His ejection fraction

was 55 percent and he had a 90 percent proximal LAD lesion. *Id.* at 594. During the follow up

visits at Interventional Cardiology, Plaintiff reported feeling well. *Id.* at 595. He denied having

chest pain or shortness of breath. *Id.*

Plaintiff returned to Dr. Mottahedeh on February 17, March 17, May 12, June 16, July

14, August 18, and September 16, 2015 for low back pain. *Id.* at 737, 742, 747, 753, 759, 764,

769. Dr. Mottahedeh noted Plaintiff's persistent complaints and his statement that pain still best

with lying down. *Id.* at 737. She observed myofascial trigger points, the same ranges of motion,

moderate hypertonicity, positive right seated root test, and decreased sensation to right touch at

right L4, L5, and S1. *Id.* at 740. She advised injections as needed. *Id.* at 740-41. She stated

11

Plaintiff would be undergoing a microdiscectomy that had been approved. *Id*. at 737. Plaintiff

was on blood thinners after recent myocardial infarction. *Id*. at 740. On May 12, 2015, Dr.

Mottahedeh noted Plaintiff's cardiologist said he would be on blood thinners for at least a year,

and microdiscectomy would be in the future. *Id*. at 750. In fact, in March 2015, Dr. William

Chung noted that Plaintiff "reports he will need back surgery at some point I would recommend

holding off for one year. If it is absolutely necessary his Effient may stopped at six months." *Id*.

at 596.

On December 16, 2015, Plaintiff saw Dr. Mottahedeh concerning his low back pain with

right lower extremity symptoms and Plaintiff reported that his symptoms waxed and waned, but

they were worse with bending, getting out of bed, lifting, standing, and sitting. *Id*. at 501 He

stated that his pain improved with lying down. *Id*. Dr. Mottanhendeh noted that there would be

no surgery at this time due to blood thinners. *Id*. Plaintiff was seen again by Dr. Mottahedeh on

January 19, 2016 for low back pain and right lower extremity symptoms. *Id*. at 787. Dr.

Mottahedeh noted myofascial trigger points to the bilateral lateral paraspinal muscles and lumbar

flexion of 70 degrees and extension of 10 degrees. *Id*. at 790. She also noted that Plaintiff's gait

was normal and was not antalgic and that he had positive seated root test on the right. *Id*. Dr.

Mottahedeh continued to prescribe Nucynta and Soma. *Id*. Dr. Mottahedeh diagnosed lumbar

radiculopathy, lumbar degenerative disc disease, lumbar disc displacement, myofascial pain

syndrome, and lumbar spinal stenosis. *Id*. Plaintiff continued treatment with Dr. Mottahedeh on

February 16, 2016. *Id*. at 798. Her findings and diagnoses remained consistent with those of

January 19, 2016. *Id*. at 801.

On March 2, 2016, Dr. Richard Shlofmitz reported that Plaintiff was to continue on blood

thinners for another six months and then be reevaluated to allow for back surgery. *Id*. at 601.

On April 12, 2016, Dr. Mottahedeh concluded that Plaintiff had achieved maximal medical improvement and that he would be undergoing back surgery once he was cleared to come off blood thinners. *Id*. at 808. The examination saw myofascial trigger points, 70 degrees of lumbar flexion, 10 degrees extension, positive right seated root test, diminished sensation to light touch in the right lower extremity, and diminished right Achilles reflex. *Id*. at 807. She reiterated the same on May 10, 2016. *Id*. at 813-14.

A left knee MRI dated June 24, 2016 revealed a ganglion degenerative ligament with adjacent change of the femoral condyle at the origin of the ACL without tearing, a radial tear apex of the body of the medial meniscus, arthropathy, preferentially to the medical tibial plateau with full thick ness cartilage loss and patella with cartilage fissures and fibrillation, and joint effusion. *Id*. at 519. An MRI of the cervical spine dated June 24, 2016 revealed annular tear at C3-4, posterior central disc herniation at C4-5, broad-based posterior disc herniation at C5-6, disc bulges at C5-6 and C6-7, and arthrosis and right neuroforaminal narrowing at C6-7. *Id*. at 821-22.

### C. Medical Expert Evidence

Plaintiff was examined by a number of medical experts following the onset date. First, on May 31, 2011, Dr. Lee Kupersmith conducted an Independent Medical Examination (IME) related to a worker's compensation claim filed by Plaintiff. *Id*. at 466-69. Dr. Kupersmith noted that Plaintiff had received six acupuncture treatments and had not sought chiropractic care. *Id*. at 466. Dr. Kupersmith noted that, upon examination, Plaintiff was in no acute distress, walked without evidence of an antalgic gait and was able to stand on his toes and his heels. *Id*. at 467. Plaintiff's strength was full (5/5) in the bilateral lower extremities with 2+ deep tendon reflexes throughout. *Id*. at 468. The examination saw lumbar flexion of 50 degrees (60 degrees being

normal) with 20 degrees extension (25 degrees normal), rotation normal, and lateral flexion normal. *Id*. at 468. Right straight leg raise was equivocal. *Id*. Dr. Kupersmith diagnosed Plaintiff with a lumbrosacral sprain. *Id*. Plaintiff's prognosis was fair. *Id*. Dr. Kupersmith noted a moderate, partial disability, opining that Plaintiff, "may return to work light duty in a sedentary type job" with no lifting greater than 10 pounds. *Id*. at 468-69. Dr. Kupersmith opined that Plaintiff had no restrictions with regard to walking, sitting, standing, cooking, cleaning, personal hygiene, child-care needs, or running errands. *Id*. at 469.

Next, on June 26, 2012, Dr. David Benatar also conducted an IME related to a worker's compensation claim. *Id*. at 471-74. Dr. Benatar noted that Plaintiff's gait was normal and he could heel walk and toe walk. *Id*. at 472. According to Dr. Benatar, Plaintiff's motor and sensory examination was intact in both lower extremities and his left knee had effusion and positive patellar grind test. *Id*. Plaintiff displayed a normal range of motion in the left knee. *Id*. This examination revealed tenderness to palpation of the right lumbar paraspinals and right sciatic notch, mild spasm, and range of motion including 70 degrees of flexion, 10 degrees extension, 20 degrees right side bending, and 25 degrees left side bending. *Id*. Straight leg raises were positive bilaterally. *Id*. Dr. Benatar assessed lumbar sprain and aggravating disc herniation. *Id*. at 473. Plaintiff's prognosis was fair. *Id*. Dr. Benatar opined that Plaintiff had a moderate, partial disability and thought Plaintiff should be allowed to return to light duty work with limitations on lifting, carrying and bending. *Id*. No further assessment of functionality was made.

On May 7, 2013, Dr. Benatar conducted a second IME noting that Plaintiff sustained an injury on August 25, 2010 which resulted in low back pain with radiation to the right leg, and Plaintiff had worked until January of 2011. *Id*. at 452. Plaintiff also had had a prior injury to the

lumbar spine in 2008. *Id*. Plaintiff reported that he tried physical therapy, but it made his leg pain worse. *Id*. Plaintiff indicated he had received an injection December 2012. *Id*. Plaintiff also reported that he had had two prior left knee surgeries and one right knee surgery. *Id*. Dr. Benatar concluded that Plaintiff's knee pain was not related to the work injury and therefore it was not further addressed. *Id*. at 453. Dr. Benatar noted that on examination, straight leg raise was positive on the right, there was tenderness to palpation of the lumbar spine, flexion of 75 degrees, extension of 5 degrees, and bilateral side bending of 25 degrees. *Id*. Dr. Benatar's impression was lumbar sprain/strain aggravating disc herniation with complaint of lumbar radiculopathy. *Id*. He stated that Plaintiff should be allowed one to further injections, and if they failed, Plaintiff would be a surgical candidate. *Id*. Dr. Benatar opined that Plaintiff had "a moderate partial disability of approximately 50 percent" and stated he should be allowed to return to a light duty occupation. *Id*.

On October 15, 2013, Dr. Benatar conducted a third IME. *Id*. at 490-93. This examination saw 80 degrees of lumbar flexion with 10 degrees extension and 25 degrees side bending. *Id*. at 491. Straight leg raising was positive at 80 degrees bilaterally, and there was decreased sensation in the right lower extremity in a stocking-glove distribution. *Id*. Dr. Benatar opined that Plaintiff had moderate, partial disability with limitation to light work. *Id*. at 492.

On May 6, 2014, Dr. Benatar conducted a fourth IME. *Id*. at 456-59. The report noted that Plaintiff stated he had attempted two epidurals and a sacroiliac injection with minimal success, and he desired to have surgery. *Id*. at 456. On examination, thoracolumbar flexion was 60 degrees, with 10 degrees extension, 15 degrees left side bending, and 25 degrees right side bending. *Id*. at 457. Straight leg raises were positive bilaterally, he had decreased sensation to the right L4-5 and S1 dermatomes and there was some instability of the left anterior cruciate ligament. *Id*. at 457. Dr. Benatar's impression was lumbar sprain/strain with complaints consistent with lumbar radiculopathy secondary to aggravation of disc herniation and stenosis

15

status post left knee arthroscopy. *Id*. at 457.  Dr. Benatar noted: "He tries to do some work at the house but he says he has about an hour limitation and after one hour, he is too miserable and cannot continue."  *Id*. at 458.  Dr. Benatar noted that Plaintiff had not reached maximum medical improvement at that time.  *Id*. at 463.  He opined, that Plaintiff had a "moderate, partial disability," stating Plaintiff could return to light duty, though "he should not sit or stand in the same position for greater than 1 hour." *Id*. at 458.

On June 29, 2015, Dr. John Waller, conducted an IME related to Plaintiff's worker's compensation claim.  *Id*. at 475.  Dr. Waller noted that Plaintiff was in no acute distress and ambulated with normal gait.  *Id*. at 479.  The examination revealed lumbar flexion to 50 degrees (60 degrees normal), extension to 20 degrees (25 degrees normal), and lateral bending was normal. *Id*. Seated straight leg raising was to 80 degrees, and pain went down right leg to the feet. *Id*.  Dr. Waller stated that Plaintiff was interested in back surgery but was not able to have the surgery as he was on blood thinners after a heart attack.  *Id*. at 480.  Dr. Waller opined that Plaintiff would be able to do sedentary work.  *Id*. at 481.

On February 25, 2016, Dr. Waller conducted a second IME in connection with Plaintiff's worker's compensation claim.  *Id*. at 435-42.  The examination revealed mild tenderness to palpation of the paralumbar muscles, flexion to "80 degrees (60 degrees normal)," extension to 15 degrees (25 degrees normal), and lateral bending to 25 degrees bilaterally (25 degrees normal). *Id*. at 438.  Straight leg raising was negative.  *Id*.  Dr. Waller noted there was no functional impairment of the left knee and that Plaintiff was in no acute distress and remained at full strength.  *Id*. at 437-39. Dr. Waller opined Plaintiff could return to work without restriction. *Id*. at 440.  Dr. Waller also noted that Plaintiff can stand for one hour before he has to sit

16

secondary to pain and can sit for one hour before he has to change positions secondary to pain. *Id*. at 441.

Finally, Dr. John Fkiaras conducted a consultative examination of Plaintiff on July 16, 2016. *Id*. at 826-29. Plaintiff reported neck and low back pain since 2010, neck pain at a severity of 4 of 10 and radiating into the shoulder and back pain at a severity of 5 of 10 radiating to the right leg. *Id*. at 826. Plaintiff also noted a history of right knee surgery in 1991, followed by residual pain, which has progressively worsened since 2008. *Id*. Plaintiff reported that his knee pain varied at a severity 4-9 of 10. *Id*. Plaintiff also reported that he had left knee surgery in 2014 with residual pain and a myocardial infarction in 2015 with stent placement. *Id*. He reported experiencing chest pain, shortness of breath, and dizziness with exertion. *Id*. at 827. Dr. Fkiaras reported that upon examination, Plaintiff had a normal gait and used no assistive devices for ambulation. *Id*. His examination of the lumbar spine revealed 70 degrees flexion, 25 degrees lateral flexion bilaterally, 25 degrees rotation bilaterally, pain to palpation, and positive right straight leg raises seated and supine. *Id*. at 828. Plaintiff had a normal range of motion of hips, knees, and ankles bilaterally: his joints were stable and non-tender. *Id*. Dr. Fkiaras opined "moderate limitation" in lifting, carrying, pushing, pulling and bending and "moderate to severe limitation" in squatting, kneeling and crouching. *Id*. at 829. He also advised against exposure to unprotected heights. *Id*.

### D.  Vocational Evidence

Michael Klein was called as a vocational expert at the August 6, 2018 administrative hearing to review Plaintiff's case. *Id*. at 183. When asked whether Plaintiff could return to work as a registered nurse or a hotel security manager, Mr. Klein testified that an individual of Plaintiff's age, education and work history who was limited to the light exertion level, except

that this individual could not climb ladders, ropes or scaffolds nor be exposed to unprotected heights would generally be able to perform the manager of internal security role as described but could not be performed as Plaintiff had performed it and the hypothetical individual described could not perform as a registered nurse. *Id*. at 211-212. He further testified that given the same hypothetical individual with the same restrictions except limited to sedentary work would be unable to perform either previously described skilled job. *Id*. at 214. In addition, Mr. Klein, testified that if the individual needed to be off task 20 percent of the work day, or have two unscheduled absences per month the individual would be unable to work. *Id*. Mr. Klein also testified that if an individual was limited to standing for 15-minute intervals and limited to sitting for one-hour intervals and that individual was also would also require to fully extend one of his legs while seated he would not be able to work in light of the combination of those three accommodations. *Id*. at 215.

Nevertheless, the vocational expert concluded that an individual limited to a light exertion level, except that the individual cannot climb ladders, ropes or scaffolds nor be exposed to unprotected heights would have been able to perform the requirements of representative occupations such as marker (DOT #209.587-034, unskilled job with SVP 2, generally performed at light level; there are 85,000 jobs available nationally), small product assembler (DOT #706.684-022, unskilled job with SVP 2, generally performed at light level; there are 100,000 jobs available nationally), and weigher of produce (DOT #299.587-010, unskilled job with SVP 1, generally performed at light level; there are 105,000 jobs available nationally). Tr. at 211-12. When asked if an impairment limiting the individual's ability to kneel, couch or crawl would impact the analysis, the vocational expert opined that such an individual would be limited to sedentary work, however, that individual would be able to work as an order clerk, food service, or a charge account clerk.

*Id* at 213.

## DISCUSSION

### I.    Standard of Review

#### A.  Review of the ALJ's Decision

In reviewing a decision of the Commissioner, a district court may set aside a determination "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin,* 802 F.3d 370, 374-75 (2d Cir. 2015) (citations omitted); *see* 42 U.S.C. § 405(g).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales,* 402 U.S. 389, 401) (internal quotation marks omitted)).  Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case *de novo.  Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir. 2004); *see Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir. 1998) ("[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record"); *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991) (holding that if the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review").

#### B.  The Disability Determination

To be eligible for disability benefits under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months."  42 U.S.C. §

423(d)(1)(A); *see Burgess v. Astrue,* 537 F.3d 117, 119 (2d Cir. 2008).  The Act further states

that this impairment must be "of such severity that [the claimant] is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A); *see Shaw v. Chater,* 221 F.3d 126, 131-32 (2d Cir. 2000); *Nascimento v. Colvin*,

90 F. Supp. 3d 47, 51 (E.D.N.Y. 2015); *Marinello v. Comm'r of Soc. Sec.,* 98 F. Supp. 3d

588, 592-93 (E.D.N.Y. 2015).

      In order to determine whether a claimant is disabled within the meaning of the Act, the

SSA has promulgated regulations prescribing a five-step sequential analysis for evaluating

disability claims.  *See* 20 C.F.R. §§ 404.1520; 416.920.  The Second Circuit has summarized this

procedure as follows:

> First, the Commissioner considers whether the claimant is currently engaged in
> substantial gainful activity.  If he is not, the Commissioner next considers whether
> the claimant has a 'severe impairment' which significantly limits his physical or
> mental ability to do basic work activities.  If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical evidence, the
> claimant has an impairment which is listed in Appendix 1 of the regulations.  If the
> claimant has such an impairment, the Commissioner will consider him disabled
> without considering vocational factors such as age, education and work experience
> . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry
> is whether, despite the claimant's severe impairment, he has the residual functional
> capacity to perform his past work.  Finally, if the claimant is unable to perform his
> past work, the Commissioner then determines whether there is other work which
> the claimant can perform.

*Telavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012).  The claimant bears the burden of proof at

steps one through four of the sequential inquiry, while the burden shifts to the Commissioner at

step five to show that the claimant is capable of working.  *Id.*; *Nascimento,* 90 F. Supp. 3d at

51.  In making these determinations, the Commissioner "must consider four factors '(1) the

objective medical facts; (2) diagnosis or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; (4) the claimant's educational background, age, and work experience.'" *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)(per curiam)).

## II.    Analysis

### A.  The ALJ's Ruling

At step one, the ALJ determined that Plaintiff had not engaged in substantial activity since the initial alleged onset date of January 10, 2011 through December 31, 2016, his date last insured. *Id*. at 12-13.  At step two, the ALJ found that Plaintiff suffered from coronary artery disease status post stent placement, lumbar radiculopathy, lumbar disc displacement, myofascial pain syndrome, torn meniscus of left and right knee status post surgical repairs, and cervical spine disc herniation.  *Id*.  However, at step three, the ALJ found that these impairments (considered individually or combination) did not meet the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  *Id*. at 13.  The ALJ then assessed Plaintiff's residual functional capacity ("RFC") and determined that at the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except with these additional limitations: "The claimant occasionally can climb ramps and stairs, balance, and stoop.  He cannot climb ladders, ropes and scaffolds.  He cannot kneel, crouch and crawl.  The claimant cannot work around unprotected heights."  *Id*. at 14.

At step four, with input from a vocational expert, the ALJ concluded that the physical demands of the claimant's past relevant work exceed the claimant's residual functional capacity. Therefore, the claimant would not have been able to perform his past relevant work as actually or generally performed prior to the date last insured.  *Id*. at 19.  The ALJ concluded, however, that the lack of transferability of job skills was not material to the determination of Plaintiff's

disability because using the  Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).  *Id.* at 19.  The ALJ determined that "through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and  404.1569a).  *Id.*  The ALJ found that Plaintiff was, therefore, not disabled under the Act from the onset of his disability on September 25, 2011 through December 31, 2016.  *Id.* at 20.

Plaintiff now challenges the ALJ's decision finding that Plaintiff was not disabled during the relevant period, contending principally that the ALJ did not adequately account for evidence specifically concerning leg extension and the prevention of surgery by cardiovascular issues.  *See* ECF No. 10 at 12.  In addition, Plaintiff argues that the ALJ failed to appropriately address Plaintiff's subjective report.  *Id.* at 17-18.  Defendant disagrees and maintains that the ALJ's decision was supported by substantial medical evidence and afforded the appropriate weight. ECF No. 12.

### B.  Residual Functional Capacity("RFC")

In his decision, the ALJ found that Plaintiff had the following severe impairments: coronary artery disease status post stent placement, lumbar radiculopathy, lumbar disc displacement, myofascial  pain syndrome, torn meniscus of left and right knee status post surgical repairs, and cervical spine disc herniation.  Tr. at 13.  Notwithstanding this finding, the ALJ found that Plaintiff was not disabled because he had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with certain limitations.  Plaintiff argues that the ALJ found that Plaintiff could work, contrary to the advice of opining sources, without duly considering

22

Plaintiff's concerns of leg impairments and cardiovascular issues.  Pl. Mem. at 12.  According to

Plaintiff, the ALJ afforded "some weight" to the opinions of Dr. Fkiaras and Dr. Benatar and

afforded "little weight to the remainder of the medical opinions."  Pl. Mem. at 13.

The ALJ's RFC assessment is insufficiently presented in his decision to permit the Court

to carry out its review function.  *See Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("On

the basis of the ALJ's insufficient findings here, we cannot determine whether his conclusory

statement that Ferraris could carry out sedentary work is supported by substantial evidence.").

Here, the ALJ's RFC findings were as follows:

> Based on this evidence, the undersigned reduced the claimant's residual functional
> capacity to the limited range of light work.  Moreover, the claimant was limited to no
> climbing ladders, ropes and scaffolds, kneeling, crouch and crawling, and only occasional
> climbing ramps and stairs, balancing and stooping.  He was precluded from work around
> unprotected heights.  The undersigned finds that these restrictions adequately
> accommodated the claimant's limitations associated with his symptoms of back, neck,
> and bilateral knee pain.  However, there is no indication that the claimant's physical
> symptoms were so severe that they would have precluded him from performing work
> within the residual functional capacity prior to the date last insured.

Tr. at 18.  These findings fail to provide "function-by-function assessment" of Plaintiff's "ability

to do sustained work-related physical and mental activities in a work setting on a regular and

continuing basis." SSR 96-8p ("[t]he RFC assessment must first identify the individual's

functional limitations or restrictions and assess his or her work related abilities on a function-by-

function basis, including the functions in paragraphs (b), (c) & (d) of 20 C.F.R. §§ 404.1545 and

416.945. Only after that may RFC be expressed in terms of the exertional levels of work,

sedentary, light, medium, heavy, and very heavy"); *Perez v. Berryhill*, No. 17-CV-3045, 2019

U.S. Dist. LEXIS 49364, *17, 2019 WL 1324949 (E.D.N.Y. Mar. 25, 2019) (quoting SSR 96-

8p); *see also Myers v. Apfel*, 238 F. 3d 617, 620, 621 (5th Cir. 2001) ("Exertional capacity

involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and

pulling. 'Each function must be considered separately'") (citation omitted); *Reynolds v. Commissioner of Social Security*, No. 12-CV-1167S, 2019 U.S. Dist. LEXIS 77886, 2019 WL 2020999 (W.D.N.Y. May 8, 2019) (remand necessary where "the ALJ's RFC discussion is entirely conclusory: it simply recounts the medical evidence and concludes that Plaintiff can perform light work with some limitations. There is no discussion of how the evidence supports the ALJ's conclusions or any discussion of Plaintiff's ability to maintain sustained work activity"); *Murphy v. Barnhart*, No. 00Civ.9621(JSR)(FM), 2003 U.S. Dist. LEXIS 6988, 2003 WL 470572 (S.D.N.Y. Jan. 21, 2003) ("Under the regulations, the ALJ also must analyze a claimant's RFC on a function-by-function basis").  Here, the ALJ's decision did not address Plaintiff's ability to push, pull, lift, carry, sit for extended periods, stand for extended periods, or walk in any detail nor did the ALJ address Plaintiff's ability to function for an entire work day.

The lack of detail concerning Plaintiff's functional limitations is apparent upon review of what the ALJ's RFC determination entails.  The ALJ concluded Plaintiff could engage in light work with limitations.  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  *See* 20 C.F.R. § 404.1567(a).  Social Security Ruling 83-10, 1983 SSR LEXIS 30 elaborates on the requirements of light work:

> Since frequent lifting or carrying requires being on one's feet up to two-thirds of a
> workday, the full range of light work requires standing or walking, off and on, for a total

24

of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. . . . Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk.

SSR 83-10, 1983 SSR LEXIS 30, *14, 1983 WL 31251, at *5-6; *see also Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) ("The full range of light work requires intermittently standing or walking for a total of approximately 6 hours of an 8-hour workday, with sitting occurring intermittently during the remaining time.").

None of the Plaintiff's treating providers made any such assessment, nor is such information contained in the medical records.  *See, e.g., Munoz Robles v. Saul*, No. 3:19-cv-01329 (TOF), 2020 U.S. Dist. LEXIS 164050, 2020 WL 5405877, at * (D. Conn. Sept. 9, 2020) ("To find that the Plaintiff was capable of the 'full range of sedentary work' without limitation, the ALJ needed a sufficient basis for concluding that . . . [the Plaintiff] could lift up to ten pounds and stand and walk for up to two hours in an eight-hour shift. Since the ALJ failed to make a function-by-function analysis of Plaintiff's RFC, his determination that he had the RFC for light work with limitations is not supported by substantial evidence").  The consultative expert, Dr. Fkiaras, upon which the ALJ relied, opined that Plaintiff "has a moderate limitation lifting, carrying, pushing, pulling and bending.  [Plaintiff] has a moderate to severe limitation squatting, kneeling and crouching.  The claimant is restricted from activities which require exposure to unprotected heights." Tr. at 829.  This opinion does not address Plaintiff's ability to sit, stand or walk for an extended period of time.  Two doctors who performed IMEs in connection with Plaintiff's worker's compensation case, Dr. Benatar and Dr. Waller, opined the Plaintiff could not sit or stand for more than one hour.  *Id*. at 458, 440-41.  However, the ALJ does not discuss these opinions.  "Presumably, the ALJ was suggesting that Plaintiff could, at least, stand and/or walk for six hours in an eight-hour workday and sit for at least two-hours—

25

the physical requirement for the most typical type of light work, as articulated by S.S.R. 83-10, 1983 SSR LEXIS 30. However, as noted above, a variation of light work requires 'sitting most of the time with some pushing and pulling of arm or leg controls.'" *Hayes v. Colvin*, 13-CV-1566 (MAD/TWB), 2015 U.S. Dist. LEXIS 29031, 2015 WL 1033058, at *9 (N.D.N.Y. Mar. 9, 2015) (quoting 20 C.F.R. § 404.1567(b)). Because of the ALJ's failure to specify Plaintiff's RFC, the Court cannot determine if the ALJ concluded that Plaintiff could sit or stand for long enough in an eight-hour workday (presumably six hours) to satisfy the requirements for this type of light work. *See, e.g., White v. Secretary of Health and Human Services*, 910 F.2d 64, 66 (2d Cir. 1990) (a doctor's report that the plaintiff had no limitations on standing and walking did not support the ALJ's conclusion that plaintiff could perform a full range of light work, because the report also stated that plaintiff could only sit for four hours in an eight-hour workday and had limitations on handling, pushing, and pulling, which would not satisfy the requirements for the light work that involved mostly sitting with some pushing and pulling of arm and leg controls); *Burton v. Colvin*, No. 6:12-CV-6347, 2014 U.S. Dist. LEXIS 75154, 2014 WL 2452952, at *10 (W.D.N.Y. June 2, 2014) (the ALJ erred by failing specifically to determine plaintiff's ability to sit, stand, walk, lift, carry, and bend in the context of an eight-hour workday); *Clark v. Barnhart*, No. 02-CV-4626, 2003 U.S. Dist. LEXIS 16168, 2003 WL 22139777, at *3 (E.D.N.Y. Sept. 16, 2003) (in describing RFC for light work, more exacting description of the claimant's ability, e.g., to stand or walk, is necessary, rather than mere resort to conclusory labels). The ALJ did not cite any medical opinion evidence that would suggest that Plaintiff was capable of the prolonged sitting, standing, and/or walking during an eight-hour workday, as the ALJ apparently concluded. *See, e.g., Burton v. Colvin*, 2014 U.S. Dist. LEXIS 75154, 2014 WL 2452952, at *10 (no acceptable or other medical source opined that she was able to stand or walk most of the

26

workday; the ALJ erred by not explaining the basis for his unstated conclusion that plaintiff would be capable of walking for up to six hours per eight-hour day); *Andrews v. Astrue*, 7:10-CV-1202 (RFT), 2012 U.S. Dist. LEXIS 117956, 2012 WL 3613078, at *9 (N.D.N.Y. Aug. 21, 2012) (there is no support in the medical record for the ALJ's RFC assessment that plaintiff can engage in light work; the ALJ failed to point to what evidence supports his findings, but instead, simply discounts the other medical opinions).

Here, the ALJ cites no medical evidence in support of his conclusion that Plaintiff's RFC was in the limited range of light work, and noted that "there is no indication that the claimant's physical symptoms were so severe that they would have precluded him from performing work within the residual functional capacity prior to the date last insured." Tr. at 18. The only evidence provided relating to Plaintiff's ability to function over the course of an eight-hour day came from Plaintiff himself. Plaintiff testified at the hearing before the ALJ as follows:

> Q. And what about standing in one place? Suppose you had a job where you had to, for instance, stand at a counter. How long do you think you could do that?
> A In one place? Not too long.
> Q If you were going to estimate, how long is not too long?
> A 15 minutes.
> Q Why only 15 minutes?
> A Because between my back and my knees, there's no way I could stay in one spot.
> Q Now, suppose you had a job sitting at a desk and you had to work at that desk sitting, but, for instance, you couldn't extend your leg like that. How long do you think you would be able to sit there?
> A Up to an hour tops on, like, a real -- on a good day.
>     *   *   *
> Q What if you could find a very easy job? You wouldn't have to lift or carry much. And on this job, you'd be able to stand up or sit down whenever you wanted. Do you think you could do a job like that eight hours a day five days a week?
> A. No way. Absolutely not.
> Q Why not?
> A. Every day's an adventure. At least three or four days a week, I'm, kind of, limited, really, mostly in the house and in the backyard. And --
> Q Well, what do you do in the house on those days?
>
> A I'll read. I'll lay down, watch TV, ice my leg. I'll read the news.

Tr. at 207-08.  Despite this testimony, and without citing any medical evidence to the contrary, the ALJ determined, in a conclusory manner, without any discussion of the seven strength demands necessary, that Plaintiff would be able to work an eight-hour day.  Absent a more specific assessment, the Court is unable to determine if the ALJ's RFC determination is supported by substantial evidence.

Moreover, the only opinion which the ALJ afforded any weight was that of Dr. Fkiaras, and that opinion was discounted by the ALJ who noted that "the undersigned finds that this opinion is somewhat vague and ambiguous.  In light of the medical records acquired at the hearing level showing on-going care for several medical conditions, the undersigned is persuaded that the claimant's exertional abilities are somewhat compromised, but remain close to the "light" exertional level. This is consistent with the consultative report, which showed relatively unremarkable musculoskeletal and neurological findings."  *Id.* at 18.  However, the ALJ is not free to substitute his own interpretation of the medical evidence in the record for that of an opinion from an acceptable medical source.  *See, e.g., Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("In the absence of a medical opinion to support the ALJ's finding as to [plaintiff]'s ability to perform sedentary work, it is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for [a] competent medical opinion'") (quoting *McBrayer v. Sec'y of Health & Hum. Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)); *Ruffin v. Comm'r of Soc. Sec.*, No. 18-CV-1307-FPG, 2020 U.S. Dist. LEXIS 13264, 2020 WL 419365 (W.D.N.Y. Jan. 27, 2020)("[t]he ALJ improperly substituted his lay opinion in determining Plaintiff's RFC and failed to adequately develop the record. For these reasons, remand is required"); *Perez v. Berryhill*, 2019 U.S. Dist. LEXIS 49364, *15, 2019 WL 1324949  (remanding for an RFC

assessment identifying Plaintiff's physical and functional limitations and assessing work-related abilities).

Thus, the undersigned respectfully recommends that this matter be remanded for the Commissioner to properly assess and articulate Plaintiff's RFC with sufficient specificity and present the evidence upon which the Commissioner relies to support the RFC determination. Additionally, the undersigned recommends that Plaintiff's request for a definitive determination of disability and a calculation of benefits be denied because the record does not lead to the definitive conclusion that Plaintiff is disabled. *See Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 2000) (directing remand for further proceedings where the record was not entirely persuasive with respect to the plaintiff's disability).

### 3. **Subjective Complaints of Pain**

Plaintiff also contends that the ALJ failed to appropriately assess Plaintiff's subjective complaints. Pl. Mem. at 17. According to Plaintiff, the ALJ did not adequately consider the meaning of "stable" findings in light of Plaintiff's cardiovascular complaints and also failed to consider Plaintiff's subjective complaints regarding pain. *Id*. at 17.

Because the Court concludes that the ALJ did not properly assess and articulate Plaintiff's RFC with sufficient specificity, or, present the evidence upon which the Commissioner relies to support the RFC determination, the Court declines to address Plaintiff's contention that the ALJ failed to properly assess his subjective complaints. *See, e.g., Ramirez v. Saul*, No. 20 Civ. 2922 (NSR)(JCM), 2021 U.S. Dist. LEXIS 124572, *38 (S.D.N.Y. July 2, 2021) ("[s]ince the Court concludes that the ALJ did not develop the record and recommends remand on that basis, the Court declines to address Plaintiff's contention that the ALJ failed to properly consider" other factors); *Perez v. Berryhill*, 2019 U.S. Dist. LEXIS 49364, *18, 2019 WL 1324949 ("[t]he Court

will not reach this question because, as previously discussed, the ALJ's RFC determination is not supported by substantial evidence"); *Haskins v. Astrue*, No. 08-CV-1107 (FJS), 2010 U.S. Dist. LEXIS 86267, 2010 WL 3338742, at *7 (N.D.N.Y. Apr. 23, 2010) (declining to reach plaintiff's remaining challenges after finding that the ALJ did not effectuate his duty to develop the record).

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel for each of the parties. Any written objections to the Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. **Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court of Court of Appeals.** *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.").

Dated: Central Islip, New York
       September 13, 2021

                    _____/s/_____
                    ARLENE R. LINDSAY
                    United States Magistrate Judge